UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

STEPHANIE CLEGG,

                Plaintiff,

    – against –

SOTHEBY'S,

                Defendant.

**OPINION & ORDER**

1:23-cv-01995 (ER)

RAMOS, D.J.:

    Stephanie Clegg brings this action for monetary damages and equitable rescission against Sotheby's, Inc. arising out of Clegg's consignment of a painting, *Le couple au bouquet de fleurs*, c. 1950 (the "Painting"), which was attributed to the renowned twentieth century artist Marc Chagall. Doc. 1 at ¶ 1. Clegg alleges she is owed $175,000 in monetary damages due to Sotheby's breach of its fiduciary duty, breach of the parties' contract, breach of the implied covenant of good faith and fair dealing, and for gross negligence. Alternatively, Clegg asks the Court to rescind the parties' agreements due to unilateral mistake or equitable rescission. Before the Court is Sotheby's motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), with prejudice. Doc. 9. For the reasons set forth below, the motion to dismiss is GRANTED, except as to Sotheby's recovery of its attorney's fees.

**I.    BACKGROUND**

    **A.  Factual Background**[1]

    Clegg is an art collector who resides in Naples, Florida. Doc. 1 at ¶ 7. Sotheby's is an art broker that maintains its corporate headquarters in New York. *Id.* at ¶ 8. Clegg

---

[1] The facts contained herein are the facts as alleged in the complaint. Clegg makes certain factual assertions in opposition to Sotheby's motion that are not included in the complaint. *See e.g.*, Doc. 15 at 13 (referencing an appraisal conducted by Sotheby's in 2020 that is not discussed in the complaint). Facts not set forth in the complaint will not be considered by the Court. *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to amend [her] pleading through

(along with her husband) bought and sold works of art exclusively from Sotheby's for over thirty years, which entitled her to many privileges reserved for long-term customers and caused her to trust Sotheby's. *Id.* at ¶¶ 9–17.

On October 10, 1988, Chagall's relatives formed the Comité Marc Chagall (the "Comité"), a French association in Paris that authenticates artwork associated with the artist. Doc. 15 at 5 n.3.

Clegg purchased the Painting from Sotheby's in 1994 for $90,500. Doc. 1 at ¶ 19. Sotheby's represented that the Painting was authentic, *id.* at ¶ 20, and listed the Painting's provenance as "L. Praeger, Paris; Galerie Petrides, Paris; Private Collection; and Achim Moeller Fine Art Limited, New York." *Id.* at ¶ 38. The provenance did not include the date the Painting was acquired by either L. Praeger or Achim Moeller Fine Art Limited. *Id.* At the time of the sale, Sotheby's did not inform Clegg of the Comité's existence or that the Painting had not been authenticated by it. *Id.* at ¶ 21.

In 2008, Sotheby's appraised the Painting at $100,000—consistent with its purported authenticity—and again neglected to inform Clegg of the Comité's existence.[2] *Id.* at ¶¶ 22–23. At that time, Sotheby's removed "Galerie Petrides, Paris" from the Painting's provenance without explanation. *Id.* at ¶¶ 24, 42. Sotheby's also did not inform Clegg that in 1979, Paul Petrides (Galerie Petrides' namesake) was convicted of selling stolen art and was sentenced to three years in prison.[3] *Id.* at ¶ 41.

In 2020, Clegg approached Sotheby's to sell art from her collection. *Id.* at ¶ 25. On March 10, 2020, Carolyn Nagy[4] emailed Clegg with a list of art from Clegg's

---

statements in [her] brief."); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (refusing to allow a party to amend a complaint via a brief).

[2] There is no indication in the complaint as to why Sotheby's appraised the Painting in 2008.

[3] *See* Ronald Koven, *Broken: Art-Theft Pipeline*, WASH. POST, Apr. 18, 1979, https://www.washingtonpost.com/archive/lifestyle/1979/04/18/broken-art-theft-pipeline/ffb7bb02-1c01-4b74-bc79-cf82de3e7d63.

[4] At all relevant times, Carolyn Nagy was a Vice President and head of Sotheby's Conshohocken, Pennsylvania office. Doc. 1 at ¶ 16.

2

collection that would sell "to their greatest financial advantage," including the Painting. Doc. 18-2 at 2 ("Nagy's Email"). Nagy also wrote

> If you were inclined to include the [Painting] . . . [Sotheby's] would need to have [it] picked up fairly quickly *so that we have time to conduct the additional authentication* before our catalogue deadline for May.

*Id.* (emphasis added). In the sale schedule attached to Nagy's Email, Sotheby's indicated that as part of the authentication process, the Painting "*must be shipped to Paris*." *Id.* at 6 (emphasis added). Clegg decided not to sell the Painting at that time. *See* Doc. 1 at ¶¶ 26–28.

On May 6, 2020, Sotheby's once again wrote to Clegg that "we would love to pick" up the Painting because Sotheby's was having success selling "Impressionist & Modern Art" as evidenced by a recent sale "above the high estimate." *Id.* at ¶ 27. Shortly thereafter, Clegg agreed to sell the Painting and had Sotheby's pick it up. *Id.* at ¶ 28.

On May 29, 2020, Clegg signed an agreement with Sotheby's, in which she agreed to consign the Painting to Sotheby's to sell at auction, after which Sotheby's would receive a commission (10% of the sale price) (the "Consignment Agreement").[5] Doc. 6-1 at 2. The Consignment Agreement provides that Sotheby's would have "absolute discretion" regarding its consultation with experts and research regarding the Painting's provenance prior to the auction. *Id.* The Consignment Agreement also lays out the actions Sotheby's would take on Clegg's behalf and the restrictions imposed on Clegg under their consignment relationship. *Id.* at 2–8. The Consignment Agreement further provides that it represents the "entire agreement between the parties . . . and supersede[s] all prior or contemporaneous written, oral or implied understandings, representations and agreements." *Id.* at 8. Finally, the Consignment Agreement provides

---

[5] Clegg's signature on the Consignment Agreement is dated June 2, 2020, Doc. 6-1 at 9, but both parties agree that the Consignment Agreement was entered into "on or about May 29, 2020." Doc. 11 at 7; Doc. 15 at 7.

3

that neither party may "amend, supplement or waive any provision of this Agreement other than by means of a writing signed by both parties." *Id.* at 7.

On September 1, 2020, Clegg received a one-page letter from Sotheby's requesting permission to submit the Painting to the Comité to obtain a certificate of authenticity (the "Release Letter"). Doc. 6-2 at 2. Clegg alleges that this was the first time she was informed of the Comité's existence and the possibility that the Painting could be destroyed if it was deemed inauthentic.[6] Doc. 1 at ¶ 29. The Release Letter states that "Sotheby's cannot accept any responsibility for the research and determinations of the Comité . . . and the actions of [the] Comité . . . should [it] have reason to doubt the authenticity of the [Painting]." Doc. 6-2 at 2. The Release Letter also provides that by signing it, Clegg was "agree[ing] to release and indemnify Sotheby's . . . from any and all claims . . . in connection with [its] submitting the [Painting] to the Comité." *Id.* The Release Letter concludes, "[Clegg] acknowledge[s] that should the Comité . . . have in fact reason to doubt the authenticity of the [Painting], [it] may retain possession of the [Painting] and inform the police . . . who in turn may seize the [Painting]." *Id.*

Simultaneously with the Release Letter, Sotheby's sent Clegg a form required by the Comité, which sets forth the general procedures that it would follow in authenticating the Painting (the "Submission Form").[7] Doc. 10-4 at 2. The Submission Form explains that "[i]f the [Comité] gives a negative opinion, [] Chagall's heirs . . . [may] bring legal proceedings to seize the work which has been declared a forgery and/or take any other measure provided for by French law." *Id.* at 4. The Submission Form then recites the

---

[6] The Release Letter is dated August 28, 2020, but Clegg asserts that she was not informed of the Comité's existence until September 1, 2020. Doc. 1 at ¶ 29. The Court also notes that in a letter dated January 3, 2022, Clegg's attorney says that Clegg was informed of the existence of the Comité when she "was considering consigning the [Painting]." Doc. 18-3 at 3. In fact, Clegg consigned the Painting in May 2020, months before receiving the Release Letter.

[7] Sotheby's is not a party to the Submission Form.

4

pertinent French statute, which establishes that Chagall's heirs "are entitled to . . . physical seizure of the alleged forged works." *Id.*

On September 3, 2020, Clegg requested to speak to Nagy before signing the Release Letter and Submission Form and expressed concern about submitting the Painting to the Comité. Doc. 1 at ¶¶ 32–33. During their telephone conversation, Nagy assured Clegg that the Comité rarely seizes art and that the Painting was authentic, so Clegg had "nothing to worry about." *Id.* at ¶¶ 33–34. Nagy also represented that Sotheby's would conduct additional research prior to submitting the Painting to the Comité. *Id.* at ¶ 36. Clegg signed both the Release Letter and the Submission Form.[8] Doc. 6-2 at 2; Doc. 10-4 at 6.

On October 6, 2020, the Comité unanimously concluded that the Painting was inauthentic. Doc. 6 at 3. As such, it requested the seizure and destruction of the Painting.[9] Doc. 1 at ¶ 3.

### B. Procedural History

Clegg filed the instant complaint on March 8, 2023, asserting six claims against Sotheby's: breach of fiduciary duty; breach of contract; breach of the covenant of good faith and fair dealing; gross negligence; unilateral mistake; and equitable rescission. *Id.* at ¶¶ 46–90.

On April 27, 2023, Sotheby's submitted a letter motion requesting a conference prior to filing a motion to dismiss. Doc. 6. At the conference, the Court granted Sotheby's leave to file its motion. Min. Entry dated May 17, 2023. Sotheby's filed the motion on June 7, 2023, Doc. 9, and the motion was fully briefed on July 19, 2023. Doc. 17.

---

[8] Neither signature is dated. Doc. 6-2 at 2; Doc. 10-4 at 6.

[9] The record is silent regarding whether the Painting has been destroyed or if it is still in the Comité's possession.

II.     **LEGAL STANDARD**

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielson v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotations omitted).

III.     **DISCUSSION**

Notably, Clegg does not bring any claims against Sotheby's related to the sale of the Painting in 1994 or its appraisal of the Painting in 2008. *See generally* Doc. 1. Thus, the focus of this dispute is on Sotheby's alleged conduct in 2020.

### A. Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty, New York law requires: "the existence of a fiduciary duty . . . a knowing breach of that duty, and . . . damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).

*1. The Consignment Agreement Created and Defined Sotheby's Fiduciary Duties*

While the complaint discusses Clegg's exclusive thirty-year relationship with Sotheby's at some length, prior to consignment, there was no fiduciary relationship between Clegg and Sotheby's. *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ("[T]he fact that one party trusts the other is insufficient to create a fiduciary relationship.") (internal quotations omitted). Then, on May 29, 2020, Clegg signed the Consignment Agreement. Doc. 6-1 at 9. At that moment, Clegg became a consignor, triggering Sotheby's fiduciary duties as consignee. *Cristallina S.A. v. Christie, Manson & Woods Int'l., Inc.*, 502 N.Y.S.2d 165, 171 (App. Div. 1986).

However, fiduciary duties can be "defined and circumscribed" by agreement. *Sveaas v. Christie's, Inc.*, 452 F. App'x 63, 66–67 (2d Cir. 2011). Here, the Consignment Agreement, which states that it was the "entire agreement between the parties . . . and supersede[s] all prior or contemporaneous . . . agreements," defined the relationship between the parties. Doc. 6-1 at 8.

*2. The Release Letter Modified Sotheby's Fiduciary Duties*

The Consignment Agreement provides that it may only be amended by "a writing signed by both parties." *Id.* at 7. Sotheby's contends that the Release Letter "expressly modified the fiduciary duty Sotheby's owed to [Clegg]." Doc. 11 at 10. The Release Letter explains that Sotheby's was required to submit the Painting to the Comité for authentication. Doc. 6-2 at 2. It also provides that "Sotheby's cannot accept any responsibility for the research and determinations of the Comité . . . and [its] actions," as it explicitly discusses the possibility that the Painting might be seized by the Comité. *Id.* The Release Letter concludes by informing Clegg that by signing, she was "agree[ing] to

7

release and indemnify Sotheby's . . . from any and all claims . . . in connection with . . . submitting the [Painting] to the Comité." *Id.* Clegg signed the Release Letter. *Id.*

Fiduciary duties may be modified by contract. *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 506–07 (S.D.N.Y. 2020), *aff'd*, 29 F.4th 118 (2d Cir. 2022); *Greenwood v. Koven*, 880 F. Supp. 186, 194 (S.D.N.Y. 1995) ("[T]he terms of an agency relationship may be modified by contract."). The Court finds that the Release Letter—a writing signed by both parties—further defined the fiduciary duties that Sotheby's owed to Clegg. The Release Letter obliges Sotheby's to submit the Painting to the Comité (a duty that was absent from the Consignment Agreement) and limits Clegg's ability to hold Sotheby's liable with respect to its performance of that duty, and the Comité's determination.

3. *Sotheby's Did Not Breach Its Fiduciary Duty*

According to the complaint, after Clegg indicated her desire to sell art from her collection in March 2020, Nagy emailed Clegg, saying if she wanted to sell the Painting, Sotheby's would need to "conduct additional authentication before [Sotheby's] catalogue deadline for May," which would require "shipp[ing] [the Painting] to Paris." Doc. 18-2 at 2, 6. Clegg did not sell the Painting at that time but later agreed to consign the Painting—and signed the Consignment Agreement—on May 29, 2020. Doc. 1 at ¶¶ 27–28; Doc. 6-1 at 9. After receiving the Release Letter on September 1, 2020, Clegg contacted Nagy, who assured her that the Painting was authentic and that the Comité rarely seizes art. Doc. 1 at ¶¶ 33–34. Nagy also assured Clegg "that [] additional research would be conducted" prior to submitting the Painting to the Comité. *Id.* at ¶ 36. Clegg then signed the Release Letter. Doc. 6-2 at 2.

Clegg claims Sotheby's breached its fiduciary duties in multiple ways. Doc. 15 at 10–11. First, Clegg asserts that Sotheby's was not entitled to ignore red flags that were known to it regarding the Painting's provenance (specifically its association with Paul

8

Petrides, a convicted felon) prior to submitting it to the Comité.  Doc. 1 at ¶¶ 37, 51; Doc. 15 at 10.  Second, Clegg argues that Sotheby's neglected to inform her of the frequency with which the Comité seizes art.  Doc. 1 at ¶ 51.  Third, Clegg indicates that Sotheby's breached its duty by "failing to defend the authenticity of the [Painting]."  *Id.* at ¶ 52.  Finally, Clegg claims Sotheby's was "objectively required" to conduct additional research prior to submitting the Painting to the Comité pursuant to Nagy's oral assurance that Sotheby's would do so.  Doc. 15 at 10; Doc. 1 at ¶ 50.

Sotheby's refutes these claims primarily by reference to the Consignment Agreement and Release Letter, which together conferred on Sotheby's "absolute discretion" in consulting with experts and in researching the Painting's provenance, Doc. 6-1 at 2, and indemnified Sotheby's from any action the Comité may take with respect to the Painting, Doc. 6-2 at 2; Doc. 11 at 11–13.  Neither the Consignment Agreement nor the Release Letter required Sotheby's to raise or look for red flags prior to submitting the Painting to the Comité.  Doc. 6-1; Doc. 6-2 at 2.  The two documents also did not require Sotheby's to inform Clegg of the frequency with which the Comité seizes art or to defend the Painting's authenticity in front of the Comité.  Doc. 6-1; Doc. 6-2 at 2.

Finally, Sotheby's contends that there was no promise or contract that it conduct additional research prior to submitting the Painting to the Comité.  Doc. 11 at 17.  To the extent Clegg is referring to Nagy's March 10, 2020, Email, Sotheby's points out that this email was sent prior to May 29, 2020, when the parties' executed the Consignment Agreement, which "supersede[d] all prior or contemporaneous . . . agreements."  Doc. 6-1 at 8; Doc. 17 at 8.  Thus, even if Nagy's Email could be read to suggest that Sotheby's agreed to conduct internal research (not just submitting the Painting to the Comité), it was superseded by the Consignment Agreement, which granted Sotheby's absolute discretion to consult with experts.  Doc. 17 at 7.  Additionally, the Consignment Agreement explicitly states it superseded any prior agreement, which made any duty arising out of Nagy's Email moot.  Doc. 6-1 at 8.

9

If Clegg is referring to her September 3, 2020, telephone call with Nagy, Sotheby's argues that Clegg failed to "outline facts supporting the existence of any enforceable agreement to this effect." Doc. 11 at 17. Even if Nagy had made such a commitment, Sotheby's concludes that Clegg has failed to identify specific facts that "amounted to *a knowing breach* of its modified fiduciary duty." Doc. 17 at 7.

The Court agrees with Sotheby's. The scope of the fiduciary duties Clegg references, including the "duty to exercise reasonable care, honest judgment, and to act in good faith" were circumscribed by the Consignment Agreement and the Release Letter. *JN Contemp. Art*, 507 F. Supp. 3d at 506–07. The Consignment Agreement conferred "absolute discretion" on Sotheby's regarding its consultation with experts and research of the Painting's provenance and could only be modified by a writing signed by both parties. Doc. 6-1 at 2. The Release Letter explicitly raised the possibility that the Painting could be confiscated if the Comité determined the Painting was inauthentic and imposed no obligation on Sotheby's to raise red flags, conduct preliminary research, or advocate on Clegg's behalf to defend the Painting's authenticity. Doc. 6-2 at 2. On the contrary, it releases Sotheby's entirely from any obligations related to submitting the Painting to the Comité. *Id.* Finally, with respect to Nagy's alleged representation on the September call, Clegg has not alleged sufficient facts to establish that the parties agreed to modify the Consignment Agreement's fiduciary duties. *See Vall. Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012) (finding that a contract has not been sufficiently plead if a plaintiff did not establish its date and major terms). This is especially so, since the Consignment Agreement prevented the parties from making oral amendments or alterations to its terms. Doc. 6-1 at 7. Having acted well within the broad discretion afforded it by the Consignment Agreement and the Release Letter, the Court finds that Sotheby's did not breach its fiduciary duties. *JN Contemp. Art*, 507 F. Supp. 3d at 507; *Sveaas*, 452 F. App'x at 67 ("The Agreement permitted [Sotheby's] to exercise 'complete discretion' . . . It did not require [Sotheby's]

10

to . . . [act] in a particular way such that failing to do so would constitute a breach of fiduciary duty.").

### B. Breach of Contract

To state a claim for breach of contract in New York, Clegg must allege that an agreement existed with Sotheby's, which she performed but Sotheby's breached, and that she suffered damages as a result. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

In her March 10, 2020, email, Nagy told Clegg that if she wanted to sell the Painting, Sotheby's would need to conduct "additional authentication" that included shipping the Painting to Paris. Doc. 18-2 at 2, 6. On May 29, 2020, Clegg signed the Consignment Agreement with Sotheby's that "supersede[d] all prior or contemporaneous written . . . agreements" between Clegg and Sotheby's. Doc. 6-1 at 8. In September 2020, Clegg alleges that Nagy promised her that Sotheby's would conduct additional research prior to submitting the Painting to the Comité. Doc. 1 at ¶ 36. Subsequently, Clegg signed the Release Letter, further documenting the parties' relationship with and obligations to one another. Doc. 6-2 at 2.

As set forth above, the Consignment Agreement and Release Letter define the parties' relationship here. However, Clegg's breach of contract claim does not implicate either of these agreements. Doc. 1 at ¶¶ 64–69. Instead, Clegg claims that Sotheby's breached two purported promises made by Nagy at two different times: (1) the March 10, 2020 email that stated that if Clegg wished to sell the Painting, it should be picked up promptly so that "we have time to conduct additional authentication"; and (2) the September 3, 2020 phone call in which Nagy told her Sotheby's would conduct additional research prior to submitting the Painting to the Comité. The complaint, however, conflates these two promises by asserting that Sotheby's agreed "to conduct additional research before submitting the [Painting] to the Comité." *Id.* at ¶¶ 65. Based on this promise, Clegg asserts that she allowed Sotheby's to pick up the Painting months

11

prior to receiving the Release Letter and the Submission Form. *Id.* at ¶ 66. Sotheby's contends that this claim must be dismissed because if Clegg is referring to Nagy's email, it was superseded by the subsequent written agreements. Doc. 17 at 11. Alternatively, if Clegg is referring to the September call, Clegg failed to assert the essential terms of a contract. Doc. 11 at 17–18.

The Court agrees with Sotheby's. Clegg claims that Sotheby's promise to conduct its own research induced her to allow Sotheby's to pick up the Painting "months before Sotheby's presented her with" the Release Letter and Submission Form. Doc. 1 at ¶ 66. Therefore, Clegg cannot be referring to her September 2020, call with Nagy, which occurred months after the Painting was retrieved by Sotheby's in May. *Id.* at ¶¶ 32–36. If Clegg is referring to Nagy's Email, the email contained no such promise—it made no mention of the Comité at all. Doc. 18-2 at 2. Even if Nagy's Email constituted an enforceable contract, it was explicitly superseded by the subsequent Consignment Agreement. Doc. 6-1 at 8. Thus, Clegg has not stated a claim for breach of contract.

### C. Breach of Good Faith & Fair Dealing

Next, Clegg argues that Sotheby's breached the implied covenant of good faith and fair dealing. She argues that Sotheby's obligations stem from "the aforementioned agreement" by failing to conduct the additional promised research and by failing to raise red flags associated with the Painting's provenance. Doc. 1 at ¶¶ 70–74. Clegg also asserts that the "complaint contains ample allegations that Sotheby's exercised its absolute discretion arbitrarily, irrationally, and in bad faith." Doc. 15 at 16.

Clegg's claim regarding Sotheby's failure to conduct additional research stems from Nagy's assurance in September 2020. This claim is dismissed as duplicative of Clegg's breach of contract claim. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

Clegg's claim that Sotheby's failed to raise red flags stems from its obligations under the Consignment Agreement. But the Consignment Agreement grants Sotheby's "absolute discretion" in consulting with experts and in researching the Painting's provenance. Doc. 6-1 at 2. In New York, while it is true that when a "contract contemplates the exercise of discretion, the covenant of good faith and fair dealing includes a promise not to act arbitrarily or irrationally in exercising that discretion," *Sveaas*, 452 F. App'x at 66 (internal quotations omitted), the Court finds nothing in the complaint that indicates Sotheby's acted arbitrarily, irrationally, or in bad faith. From the outset, Sotheby's represented that its authentication process would involve sending the Painting to Paris to determine its authenticity. Doc. 18-2 at 6. The decision by Sotheby's not to conduct an internal authentication process before submitting the Painting was neither required by the Consignment Agreement or Release Letter, nor was it arbitrary nor irrational. Clegg has also not articulated any reason to find that Sotheby's acted arbitrarily or irrationally in neglecting to raise red flags associated with the Painting's provenance prior to submitting the Painting to the Comité. This is especially so when Sotheby's would be paid only upon a successful sale of the Painting, Doc. 6-1 at 2, and therefore stood to gain nothing if the Comité determined the Painting was inauthentic. Thus, Clegg's claim for breach of the covenant of good faith and fair dealing is dismissed.

### D. Gross Negligence

Clegg claims that Sotheby's is liable in tort for its gross negligence, which is "separate and independent from the duties owed under the Consignment Agreement." Doc. 15 at 12. To state a claim for gross negligence, New York law requires: (1) a duty; (2) a breach of that duty; (3) a resulting injury; and (4) conduct evincing "a reckless disregard for the rights of others or [that] 'smacks' of intentional wrongdoing." *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367–68 (S.D.N.Y. 2008) (quoting *Am. Tel. & Tel. Co. v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996)).

First, Clegg asserts that Sotheby's owed her a duty to exercise the same standard of care "that a reasonably prudent auction house . . . would exercise in a similar situation." Doc. 1 at ¶ 56. This duty, Clegg argues, required Sotheby's to conduct additional research before submitting the Painting to the Comité, to alert her to the potential red flags associated with the Painting's provenance, and to inform her of the frequency with which the Comité seizes art. *Id.* at ¶¶ 57–58. Clegg analogizes the instant case to *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995).[10] However, Clegg conflates the facts of the two cases. In *Foxley*, the Court allowed plaintiff's claim to survive a motion to dismiss on a negligent appraisal theory. *Foxley*, 893 F. Supp. at 1236. In the instant case, Clegg did not sue Sotheby's for negligent appraisal since the last appraisal Sotheby's conducted of the Painting was in 2008.[11] Doc. 1 at ¶ 22.

Sotheby's counters that Clegg's gross negligence claim relies on the same duty that Sotheby's owed Clegg via its contract. Doc. 11 at 14. Thus, Clegg's gross negligence claim should be dismissed because it fails to allege any duty extraneous to Clegg's breach of contract claim. *Id.* at 14–15.

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.,* 516 N.E.2d 190, 193 (N.Y. 1987). Clegg's first claim is that Sotheby's owed her a duty "to conduct additional research before submitting the [Painting] to the Comité." Doc. 1 at ¶ 57. This is precisely the same duty that Clegg asserts was owed to her pursuant to the parties' alleged agreement in her breach of contract claim. *Id.* at ¶ 65. Thus, it cannot be the basis of a tort claim. *Santini*

---

[10] Clegg asserts that "this decision was affirmed by the Second Circuit." Doc. 15 at 13. Sotheby's could find no evidence that the decision was affirmed by the Second Circuit. Doc. 17 at 8 n.4. The Court, likewise, has found no record it was ever appealed to the Second Circuit.

[11] In Clegg's opposition to Sotheby's motion, she asserts that Sotheby's conducted an appraisal in 2020, which, if true, would indeed make her case more analogous to *Foxley*. Doc. 15 at 13. However, no such allegation is made in the complaint, and accordingly, the Court will not consider it. *Wright*, 152 F.3d at 178.

14

*v. Gillian Abrams Design LLC*, 133 N.Y.S.3d 242, 243 (App. Div. 2020) ("[P]laintiff's negligence claim was properly dismissed . . . [T]here was no breach of a duty independent of a contractual duty."). Second, Clegg alleges that Sotheby's owed her the duty to raise red flags associated with the Painting's provenance. Doc. 1 at ¶ 58. This is a restatement of the duty Clegg asserted under the covenant of good faith and fair dealing, which is implied in every contract. Thus, Clegg is "essentially seeking enforcement of the bargain, [so] the action should proceed under a contract theory." *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992). As such, it should be dismissed for the same reason.

Clegg also claims that Sotheby's owed her a duty to alert her to the frequency with which the Comité seized inauthentic artwork. Doc. 1 at ¶ 58. Clegg argues that this duty does not stem from Sotheby's contractual obligations under the parties' agreements but rather due to the parties' relationship. *Sommer*, 593 N.E.2d at 1369 ("Professionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties."). Clegg asserts that Sotheby's breached this duty when Nagy told her that she had "nothing to worry about" in sending the Painting to the Comité because it was authentic and because the Comité rarely seizes art. Doc. 15 at 13. However, to state a claim for gross negligence, Clegg must also allege that Sotheby's acted with a recklessness evincing an intentional wrongdoing. *Am. Tel.*, 83 F.3d at 556. Here, Clegg offers several conclusory statements that are alone insufficient to state a claim for gross negligence.[12] *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Clegg offers no factual support for her allegation that Nagy acted recklessly or intentionally in assuring her that she believed the Painting to be authentic or that the Comité rarely seizes art. Thus, Clegg's claim of gross negligence is dismissed.

---

[12] *See e.g.*, Doc. 1 at ¶ 61 ("Sotheby's conduct evinces such a reckless disregard for [Clegg's] rights that it smacks of intentional wrongdoing.").

15

### E. Unilateral Mistake & Equitable Rescission

Alternatively, Clegg seeks rescission of the Consignment Agreement and Release Letter due to unilateral mistake or equitable rescission.  Doc. 1 at ¶¶ 75–90.

### 1. *Unilateral Mistake*

Clegg claims that she was under the mistaken beliefs:  (1) that "Sotheby's would conduct additional authentication research" prior to submitting the Painting to the Comité; (2) that the "Comité rarely seizes works"; and (3) that Sotheby's would "defend the authenticity of the [Painting]."  *Id.* at ¶¶ 76–78.  Additionally, Clegg argues that Sotheby's knew she was submitting the Painting to the Comité under these mistaken beliefs, *id.* at ¶ 79, and maintained "exclusive possession" over the information that could have allowed her to uncover the truth of these mistaken beliefs, while it "repeatedly concealed and misrepresented facts" to her, *id.* at ¶ 80.  These actions, Clegg asserts, were either conducted with an intent to deceive or by gross negligence and benefitted Sotheby's by establishing it as the art broker that Clegg patronized exclusively for thirty years.  Doc. 15 at 17.  Sotheby's counters that it did not receive any benefits from the parties' contracts that could be rescinded, Doc. 11 at 21, and that Clegg's claims amount to "baseless, illogical accusations" that fail to establish a claim for unilateral mistake, Doc. 17 at 13.

"[R]escission of a contract is an extraordinary remedy."  *Nolan v. Sam Fox Publ'g Co.*, 499 F.2d 1394, 1397 (2d Cir. 1974).  To rescind a contract for unilateral mistake, New York law requires Clegg to show that she entered the contract "under a mistake of material fact" and that Sotheby's "knew or should have known that such mistake was being made."  *Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 599 (S.D.N.Y. 2006).  Finally, the "unilateral mistake must be coupled with some fraud."[13]  *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498

---

[13] To state a claim for fraud under New York law, a plaintiff must show, "misrepresentation or omission of [a] material fact . . . which the defendant knew to be false . . . made with the intention of inducing

(S.D.N.Y. 2004) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

The Court declines to rescind the Consignment Agreement because Clegg could not have had any of her alleged mistaken beliefs when she signed it. The Consignment Agreement was entered into on May 29, 2020, Doc. 6-1 at 9, while Clegg alleges she did not know about the Comité's existence until September 1, 2020, Doc. 1 at ¶ 29. Thus, Clegg could not have signed the Consignment Agreement under the mistaken belief that the Comité rarely seizes artwork, that Sotheby's would conduct additional research before submitting the Painting to the Comité, or that Sotheby's would defend the Painting's authenticity to the Comité. Because Clegg has alleged no mistake of material fact with respect to the execution of the Consignment Agreement, rescission is not appropriate. *Creative Waste*, 429 F. Supp. 2d at 599 (to rescind the contract for unilateral mistake, a party must "*enter*[] into a contract under a mistake of material fact") (emphasis added) (internal quotations omitted).

The Court also declines to rescind the Release Letter. Clegg does allege that she operated under mistaken beliefs of which Sotheby's knew when she executed the Release Letter. Doc. 1 at ¶¶ 76–79. Specifically, Clegg asserts that she believed Sotheby's would conduct additional research prior to submitting the Painting to the Comité, that the Comité rarely seizes art, and that Sotheby's would defend the Painting's authenticity before the Comité. *Id.* However, Clegg has not sufficiently explained how these mistaken beliefs were "coupled with fraud" or made by Sotheby's with the "intention of inducing reliance." *Travelers*, 322 F. Supp. 2d at 498. Although Clegg asserts that Sotheby's was the benefactor of her patronage for almost thirty years (from 1994 to 2020), such a benefit is entirely independent of her signing the Release Letter. Additionally, Clegg has not provided any basis for establishing that Sotheby's knew

---

reliance . . . upon which plaintiff reasonably relied; and . . . which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

17

Clegg expected it to defend the Painting's authenticity in front of the Comité. *See generally* Doc. 1 at ¶¶ 76–79. This is especially so when the Release Letter Clegg signed made no such representations—rather, it represented that Sotheby's would not accept responsibility for the Comité's decisions and was released from all claims regarding the Painting's submission. Doc. 6-2 at 2. Thus, the Court will not rescind either the Consignment Agreement or the Release Letter due to unilateral mistake.

2. *Equitable Rescission*

The Court similarly declines to rescind the Consignment Agreement or the Release Letter on the ground of equitable rescission. "[R]escission is an equitable remedy which will not be granted unless [Clegg] lack[s] an adequate remedy at law." *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998). To justify rescission, Clegg "must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof." *Id.* (internal quotations omitted). Here, as stated previously, Clegg does not allege that Sotheby's breached either the Consignment Agreement or the Release Letter and insufficiently alleges that Sotheby's committed fraud in inducing Clegg to sign either agreement. Thus, the Court declines to rescind the agreements.

F.  **Attorney's Fees**

In its motion, Sotheby's claims that by initiating the instant lawsuit, Clegg violated the Release Letter, which "release[d] and indemnif[ied] Sotheby's . . . from any and all claims, lawsuits, actions, damages, losses, liabilities, expenses and demands . . . in connection with . . . submitting the [Painting] to the Comité." Doc. 6-2 at 2. Sotheby's argues that it suffered damages from Clegg's breach, namely Sotheby's legal fees in defending against this lawsuit. Doc. 11 at 21. Clegg responds that the indemnification clause in the Release Letter "does not include attorney's fees incurred in suits between [Clegg] and Sotheby's." Doc. 15 at 19. Accordingly, Clegg asserts that the

18

indemnification clause should only cover fees "arising from third-party claims." *Id.* at 19–20. However, Sotheby's is not arguing that the Release Letter includes an "attorneys' fee provision." Doc. 17 at 14. Rather, it argues that Clegg breached the Release Letter, and the appropriate measure of damages is Sotheby's attorneys' fees. *Id.*

New York law requires an agreement to be "unmistakably clear regarding whether the parties . . . intend[ed] provisions of attorneys' fees to disputes among themselves." *Coastal Power Int'l, Ltd. v. Transcon. Cap. Corp.*, 182 F.3d 163, 165 (2d Cir. 1999) (internal quotations omitted). Otherwise, the Court "will not read into an agreement a legal duty the parties did not clearly intend." *Id.* Here, the indemnification in the Release Letter did not clearly state that attorney's fees incurred as a result of any litigation would be applied to the winner of the dispute. Thus, the Court will not insert one.

Sotheby's attempt to recast its claim as a breach of contract claim fares no better. The "primary function" of the indemnification provision in the Release Letter was to "serve as a shield rather than as a sword." *Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1008 (2d Cir. 1966). In other words, its goal was to protect Sotheby's from liability for claims arising out of submitting a potentially inauthentic Painting to the Comité—not to impose liability on Clegg if she unsuccessfully sued Sotheby's for breach. *Cf. Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 50–51 (S.D.N.Y. 2004) (finding that, absent bad faith, the violation of a covenant "not to sue" will not require the violator to cover the litigation expenses imposed on the other party). Sotheby's does not allege—and the Court does not find—that Clegg exercised bad faith in bringing this lawsuit. Thus, the Court declines to require Clegg to pay Sotheby's attorney's fees.

## IV. CONCLUSION

For the reasons set forth above, Sotheby's motion to dismiss for is GRANTED except as to attorney's fees.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 9 and 19, and close the case.

It is SO ORDERED.

Dated:   November 30, 2023
         New York, New York

                                                        EDGARDO RAMOS, U.S.D.J.